Edward G. O'Connor, et al.
vs.
Consolidated Mortgage & Investment Corporation

Equity No. 10686.

July 29, 1931.

CHURCHILL, J. Petition for leave to intervene filed on behalf of What Cheer Mortgage and Finance Corporation, hereinafter called the "What Cheer Company."

The petitioner seeks to recover from the receiver of the Consolidated Mortgage & Investment Corporation, hereinafter called the "Consolidated Company," assets claimed to be the property of the What Cheer Company.

The claim is made that a proposed consolidation of four companies never took effect in law or in fact, and that the receiver is now in possession of assets belonging to the What Cheer Company without any title or right thereto.

Previous to April 4th, 1930, the What Cheer Company, Mortgage Corporation of Rhode Island, Rhode Island Mortgage Security Corporation and Rimscor Investments, Inc., were separate corporations engaged in loaning money on mortgage securities. The What Cheer Company, in addition, loaned money under the "Small Loan Act," so-called.

An instrument providing for the consolidation of the four companies, bearing date of April 4th, 1930, was executed by the proper officers of the four companies by the authority of their respective boards of directors. The stockholders of each corporation on April 14th, 1930, by a two-thirds vote of each class of the capital stock outstanding of the several corporations, ratified and approved the action of their respective officers and directors in accordance with the provisions of the consolidation agreement.

The scheme contemplated by the agreement was to effect a consolidation of the What Cheer Company, Mortgage Corporation of Rhode Island and Rhode Island Mortgage Security Corporation with Rimscor Investments, Inc., both by a transfer of assets and a transfer of the stock of the three former companies to Rimscor Investments, Inc. That company was to change its name to Consolidated Mortgage & Investment Corporation, increase its capital stock, and in consideration of the transfer of the assets to it, issue its stock to the other three companies taking part in the consolidation.

The preamble of the agreement sets forth the capital structure of each of the four companies and recites the advantages to be gained by consolidation. The agreement then provides that "in consideration of the premises and the mutual * * * covenants and grants herein contained the Mortgage Corporation of Rhode Island, Rhode Island Mortgage Security Corporation and What Cheer Mortgage and Finance Corporation do hereby respectively consolidate themselves with Rimscor Investments, Inc."

It was provided in Article VII that upon the consummation of the act of consolidation and the transfer of the stock of the consolidated corporation to the three companies entering into the plan, the rights, privileges, powers, franchises and property of the three companies should be vested in the consolidated corporation.

Article XI is the provision on which hinges the question as to whether consolidation and transfer of assets took place previous to receivership of the Consolidated Mortgage & Investment Corporation. This article provided as follows:

"This agreement shall be submitted to the stockholders of each of the said four corporations, parties to this agreement, as provided by law and shall take effect and be deemed and taken to be the agreement and act of sale and consolidation of the said corporations upon the adoption and approval thereof by the votes of the holders of two-thirds of each class of the capital stock outstanding of each of said respective companies at respective meetings of their stockholders duly called for this purpose."

On April 14th, 1930, the stockholders of the four companies by the requisite vote of the stockholders of each class of stock outstanding in the respective companies ratified and approved the agreement of consolidation. The vote as contained in the minute book of the What Cheer Company is as follows:

"The action of the president and secretary in signing said agreement is hereby ratified and is approved as being sufficient to bind this corporation."

On April 25th, 1930, Rimscor Investments, Inc., duly changed its name to Consolidated Mortgage & Investment Corporation, hereinafter called the Consolidated Company, and increased its capital stock.

At a meeting of the Consolidated Company held on April 25th, 1930, a new board of directors and new officers were elected, the board being made up from the membership of the boards of the four corporations.

On May 27th, 1930, the Board of Directors of the Mortgage Corporation

of Rhode Island voted to withdraw from the consolidation and to rescind their vote of approval of the consolidation agreement. The parties in control of the other three corporations were notified forthwith in writing of the vote of rescission by the Board of Directors.

On June 6th, 1930, the stockholders of the Mortgage Corporation of Rhode Island unanimously voted to rescind their vote of April 14th, 1930, approving and ratifying the agreement of consolidation.

The officers of the Mortgage Corporation of Rhode Island who had been elected officers of the Consolidated Company resigned. New officers of the Consolidated Company were elected and this company continued to function until February 6th, 1931, when a receiver was appointed.

The action on the part of the Mortgage Corporation of Rhode Island in rescinding its vote of ratification and approval was based on alleged misrepresentations on the part of officers and those in control of the Rhode Island Mortgage Security Corporation.

John A. Bennett was President of the What Cheer Company and a director; Ira Marcus was secretary and a director, and these two with Bjarme Erickson constituted the executive committee. Erickson was the assistant secretary and had full charge of all of the business of the company according to the testimony of Ira Marcus.

The President of the What Cheer Company was notified on May 27, 1930, of this action of the Board of Directors of the Mortgage Corporation of Rhode Island, and all the officers of the What Cheer Company and its executive committee knew of this for some weeks prior to June 30, 1930.

The stockholders of the What Cheer Company were not notified and no action was ever taken by the stockholders, officers, board of directors, executive committee, or others in control of that company, looking to rescission of the agreement or to withdrawal from the consolidation until the action of the Board of Directors just previous to the filing of the petition to intervene on March 21, 1931. On the contrary, the steps taken by the What Cheer Company and its officers after April 14th, 1930, and after knowledge of the withdrawal of the Mortgage Corporation and until the receivership, were in furtherance of the consolidation provided for in the agreement and in apparent compliance therewith. No meeting of stockholders took place after April 14th, 1930, nor were any meetings held by the executive committee, and the only meeting of the board of directors was that just before the filing of the petition in this case and after the receivership. No dividends were paid nor was any resolution passed declaring or passing dividends, and no corporate report was filed for the year 1930 with the Secretary of State

Erickson, with the knowledge of the other members of the executive committee, prepared and sent a circular letter to each stockholder of the What Cheer Company on June 30th, 1930, stating: "We have your stock in the Consolidated Mortgage & Investment Corporation ready for exchange. Kindly call with your What Cheer Mortgage & Finance Corporation stock for exchange and to sign an exchange application."

From this time until nearly to the time of the receivership Erickson continued his efforts to get in the stock of the What Cheer Company, with the knowledge and consent of Marcus and Bennett, and after June 30th, 1930, stated in letters to What Cheer Company stockholders that the consolidation had taken place and that their dividends would be paid in the future by that corporation.

As shown by the stockholders' voting list of April 14th, 1930, there were outstanding 1,246 shares of preferred stock

and 721 shares of Class A common stock of the What Cheer Company. 880 shares of preferred and 569 shares of common stock were delivered in exchange for stock of the Consolidated Company before the receivership intervened. More than two-thirds of each class had thus been handed in for exchange. The certificates were found by the receiver in the office of the Consolidated Company.

It may be pointed out here that before the receivership proceedings, February 6th, 1931, the Consolidated Company had made out and executed certificates of stock to former stockholders of the What Cheer Company for 1,146 shares of its preferred stock and for 1,857 shares of its Class A common stock. 598 shares of preferred and 984 shares of common stock had been delivered to stockholders of the What Cheer Company. 292 shares of preferred and 472 shares of common stock were found by the receiver in addressed envelopes ready for delivery.

On July 17th, 1930, application was made to the What Cheer Company to renew a bond covering its employees. On July 18th, 1930, the Company, through Mr. Erickson, the manager, wrote: "Owing to the consolidation which has been effected, we will not renew the policies covering the employees of the What Cheer Mortgage and Finance Corporation which expire August 10th."

On July 23rd, 1930, the agents of the insurance company concerned forwarded a release to cancel the bond of the What Cheer Mortgage and Finance Corporation as of August 9, 1930, and this was done.

The assets of the What Cheer Company consisted of real estate mortgages, notes and accounts receivable, and real estate.

On July 1, 1930, the assets of the What Cheer Company appeared on the books of the Consolidated Company and remained there until December 31st, 1930, when by the order of Ira Marcus they were taken off. They reappeared on the books of the Consolidated Company on January 6, 1931, and remained on until the receivership. No satisfactory reason was given for this action but the fact remains that when the receiver took charge on February 6th, 1931, the books of the Consolidated Company reflected the assets of the What Cheer Company and no books of the What Cheer Company have been put in evidence showing the financial transactions of that company. Certain cards showing loans and mortgages were found in files in the office of the Consolidated Company by the receiver.

Testimony was offered by the petitioners that no books of account of the What Cheer Company were ever kept. This testimony seems incredible, but it is not necessary to pass on the point in this proceeding. It is sufficient to say that there is no credible testimony to show that the What Cheer Company in fact, as a separate entity, transacted its regular business at least after July 1, 1930. No trial balance was taken after April 4, 1930. No entry appears in the check book of the Industrial Trust Company after April 14th, 1930, and its account in the Industrial Trust Company was closed out in September, 1930. Its effects and records were taken to the office of the Consolidated Company in the summer of 1930, and it did not pay rent for space occupied, nor light or telephone bills, or other expenses.

Erickson was elected President of the Consolidated Company in September, 1930.

In a series of letters written after the time he was elected President and while he was, on the theory of the petitioner, a member of the executive committee and general manager of the What Cheer Company, he wrote a series of letters to various debtors of the What Cheer Company on the stationery

of the Consolidated Company, stating that the account had been turned over to the Consolidated Company and requesting payment to that concern. His explanation that he took the amounts collected and applied them to his own salary account as manager of the What Cheer Company is entirely unconvincing.

On January 17, 1931, Erickson, with the knowledge of the officers of the What Cheer Company, delivered a letter to Ernest L. Sprague, Secretary of State, which set forth the fact that a consolidation had been effected between the What Cheer Company, Consolidatd Mortgage & Investment Corporation (formerly known as Rimscor Investments, Inc.), and Rhode Island Mortgage Security Corporation, and enclosed with the letter certified copies of votes of the several corporations concerned under the hands of their respective secretaries, authorizing the consolidation, and a copy of the agreement of consolidation. This document stated that the companies "were consolidated" and that this had been consummated although the Mortgage Corporation of Rhode Island had withdrawn.

At about the same time a report of the financial condition of the Consolidated Company was prepared which included therein as a part of its assets the property of the What Cheer Company, and with the knowledge of the officers of the What Cheer Company this was presented to George H. Newhall, Bank Commissioner, in order to obtain his consent for the sale of the stock of the Consolidated Company in Rhode Island.

No formal assignments, bills of sale or deeds (the agreement of consolidation excepted) were ever delivered by the What Cheer Company to Rimscor Investments, Inc., or to the Consolidated Company, of any part of its assets.

It is plain that before the receiver took possession on February 6th, 1931, the What Cheer Company had ceased to do business as a separate entity. Such business as it had was carried on by the Consolidated Company with the consent of its officers and its assets were on the books of the Consolidated Company; two-thirds of its outstanding stock had been delivered for exchange, and a large amount of Consolidated stock had been issued therefor.

At the forefront of the case stands the question of the force and effect of the agreement of consolidation.

The four companies which it was proposed to consolidate dealt in mortgages and loans and their assets consisted largely of notes receivable, accounts receivable, and a relatively small amount of real estate. The stock of the corporations had to be got in and exchanged for stock in the consolidated company. The business in the meantime must be carried on if it was to be preserved. Necessarily, if the consolidation and transfer of assets to the consolidated company was to await the complete and formal settlement of the numberless details attendant on such transactions the consolidation would be an extremely prolonged matter.

It is evident from a reading of the agreement that this difficulty was present in the minds of the parties and in the mind of the skilful counsel who drafted the agreement.

Consolidation with and transfer to Rimscor Investments, Inc., (afterwards Consolidated Mortgage and Investment Corporation) was contemplated at as early a date as was possible, leaving the details and formalities to be settled afterwards.

The provision in the agreement is that the parties "do hereby respectively consolidate themselves with the Rimscor Investments, Inc."

Article XI in accord with this provision reads:

"This agreement shall be submit-

ted to the stockholders of each of the said four corporations, parties to this agreement, as provided by law and shall take effect and be deemed and taken to be the agreement and act of sale and consolidation of the said corporations upon the adoption and approval thereof by the votes of the holders of two-thirds of each class of the capital stock outstanding of each of said respective companies at respective meetings of their stockholders duly called for this purpose."

The words "act of sale" are clear but acquire additional strength when read with the other language in the agreement.

The clause stating the consideration reads:

"In consideration of the premises and * * the provisions, agreements, covenants and grants herein contained."

Grant is a word of title and not of contract and the phrase "grants herein contained" points to the "act of sale" of each of the three parties who were transferring assets to and consolidating with Rimscor Investments, Inc.

By the use of the words "act of sale" as read in the context of the agreement the parties clearly expressed an intention to effect a present transfer at the time the instrument was ratified and approved by the stockholders of the companies concerned.

Article VII provided that "upon consummation of the act of consolidation hereby provided for, and the transfer of the stock of said consolidated corporation to the consolidating companies all the rights, privileges, powers, franchises of each of the said corporations and all property" shall thereupon become vested in the consolidated corporation.

Reading this article with Article XI, the successive steps in the plan become plain.

The date of the ratification of the agreement was the time when the act of consolidation was consummated and the transfer of assets accomplished. When all the stock was transferred then insofar as the agreement could accomplish it, all the franchises and powers of the corporations were vested in the consolidated corporation. The transfer of all their stock would leave the three corporations mere shells, possessed of powers and franchises but no stockholders. The words in this article in respect to property passing were evidently inserted out of abundant caution.

The fact that no formal assignments, endorsements, or deeds formally transferring assets had been executed and delivered before the receivership is not sufficient to defeat the right of the receiver to retain the assets as successor in title to the Consolidated Company.

The petitioner is still a legal entity and can be compelled to make such formal transfers as may be found necessary in the administration of the receivership.

Consolidation was to be effected in a two-fold manner, by stock transfer giving absolute control and ownership in fact to the consolidated corporation, and also by transfer of the assets of the three companies by an act of sale. Ownership by one corporation of stock of another corporation is legal in this State.

While it is true that the Corporation Act does not in terms provide for consolidation, it does provide for the sale, lease or exchange of all the property of a corporation.

Ch. 248, Secs. 55-56 (3520-3521) Gen. Laws 1923.

The act is liberal in its terms. No particular formalities are required. Only one condition must be complied with. The sale, lease or exchange must be authorized by the holders of two-thirds of each class of stock outstanding. It was apparently the language

of the act which the draftsman had in mind when he used the words "act of sale."

Sec. 56 contemplates an instrument of transfer. It provided that after the date of delivery of such instrument dissenting stockholders must file a petition in the Superior Court for a valuation of their stock.

If the parties so agree nothing can be perceived in the Act which prevents stockholders from agreeing to sell and providing that the agreement shall operate as a present transfer. So far as the Corporation Act is concerned there has been compliance therewith.

The petitioner argues that the basis of the consolidation was the consolidation of four companies; that this was a condition precedent to the consolidation and transfer of assets and that the Mortgage Corporation of Rhode Island having withdrawn, the plan failed and the consolidation, therefore, was never consummated.

It is true that no objection was taken by the Consolidated Company to the action of the Mortgage Corporation of Rhode Island but the assets of the Mortgage Corporation of Rhode Island never physically passed into the custody or control of the officers of the Consolidated Company. The argument on behalf of the petitioner overlooks the character of the agreement. It provided in so many words that upon ratification of the instrument by the stockholders of the four companies, it was to "take effect and be deemed and taken to be the * * * act of the sale and consolidation." By the force and effect of the instrument, its literal provisions, and by its clear intent, it was a sale to Rimscor Investments, Inc., afterwards the Consolidated Company.

The petitioner further argues that by force of the vote of rescission passed by the stockholders of the Mortgage Corporation of Rhode Island on June 6th, 1930, its vote of ratification of April 14th, 1930, became ineffective and the situation was the same as though no ratification had ever been had. The ratification of April 14th, 1930, was the act provided for by the agreement whereby the consolidation took place and was an act of sale. The force and effect of the agreement under such circumstances could not be nullified by reason of the fact that one of the companies saw fit afterwards to pass a vote of rescission.

Whatever rights the Mortgage Corporation of Rhode Island had by proper legal proceedings to annul and cancel its act of ratification are matters not before this Court. That company is not a party to this proceeding, but it is clear that its action in rescinding its vote of April 14th, 1930, could not affect rights vested by the act of ratification on April 14th, 1930, insofar as the What Cheer Company is concerned.

The petitioner next argues that it was contemplated as one of the fundamental conditions that there should be a consolidation of four companies and that as only three companies have gone in, the stockholders in the three companies remaining, who have exchanged their stock, have been deprived of the value of the assets of the Mortgage Corporation of Rhode Island by its withdrawal, and that, therefore, the What Cheer Company is entitled now to recover its assets from the receiver as on a failure of consideration.

Treating the petition broadly as a bill to rescind, it is to be noted that it is a petition by the corporation itself and not by the stockholders. Neither is there an offer to put the parties in statu quo.

In any event, the petition of the What Cheer Company comes too late. Rescission is a remedy which must be promptly sought and unless the parties can be put in statu quo, or if the rights of other parties have intervened, it will be denied.

*Hines* vs. *Saart Bros. Co.,*—R. I.—
Equity No. 928;

*Dugan* vs. *McGarry,* 145 Atl. 169,
—R. I.—

See also the leading case of
*Grymes* vs. *Saunders,* et al.
93 U. S. 55,
23 L. Ed. 798.

The officers of the What Cheer Company knew as early as May 27th, 1930, of the action of the Board of Directors of the Mortgage Corporation of Rhode Island and later of the action of its stockholders.

It was the duty of the What Cheer Company in this contingency to act promptly. A period of eight months elapsed between the time its officers knew of the withdrawal of the Mortgage Corporation of Rhode Island and the date of the receivership, and during this time the corporation took no action to dissolve its relationship with the other two companies or to cancel the agreement on the ground now set up. Its officers proceeded to consummate the details of the consolidation; got in all but a small proportion of the stock of the What Cheer Company and allowed its assets and business to go into the control of the Consolidated Company.

As has been pointed out, there was presented to the Secretary of State on January 17, 1931, a document which set forth that the consolidation had been consummated notwithstanding the withdrawal of one of the constituent companies.

Under the facts as found by the Court, whatever the rights of the What Cheer Company to rescind may have been, such rights have been waived.

*Bradford* vs. *Frankfort Elec. R. Co.,*
142 Ind. 383,
40 N. E. 471.

The rights of the parties to the agreement, both companies and stockholders, who went on with the consolidation, have been changed by reason of the position assumed by the petitioner. The Rhode Island Mortgage Security Corporation proceeded to consolidate as well as the What Cheer Company, with Rimscor Investments. Inc. The latter company was recapitalized under the agreement for consolidation, and much of the stock has been issued on the assumption that consolidation took place, and was issued on the basis that the What Cheer Company's assets were in the Consolidated Company. If such assets are now withdrawn the basis of the consolidation of the three companies will be entirely changed, and to the detriment of all who have received Consolidated Company stock.

Having assisted to bring about this situation, the What Cheer Company can not now rescind.

It is also clear that under the circumstances of this case and the facts found, the parties can not be put in statu quo, particularly after receivership has intervened.

It is said that a decree may be framed giving to all former What Cheer stockholders now holding Consolidated stock the right to exchange such stock for What Cheer stock.

The petition is not a stockholder's petition, and there is no proceeding pending in the receivership whereby the stockholders as a class are endeavoring to recover their What Cheer securities.

*Taylor* vs. *So. Pac. Co.,*
142 Fed. 147.

Furthermore, there is no evidence before the Court under the instant petition on which the Court could frame such a decree and provide for all the contingencies inevitably arising.

The petition is denied and dismissed and the cross-petition of the receiver is granted.

Hinckley, Allan, Tillinghast, Phillips and Wheeler, Abbott Phillips, Esq.

Sol. for petitioner, What Cheer Mortgage and Finance Corporation.

Isadore S. Horenstein, Sol. for receiver.